MILANETA ROBERTS, Plaintiff

v.

HENRY SESEPASARA, NANCY FERRA, and ESTATE OF MOLITUI SEPETAIO, Defendants

High Court of American Samoa
Trial Division

CA No. 44-87

July 18, 1988

Before REES, Chief Justice, AFUOLA, Associate Judge, and LUALEMAGA, Associate Judge.

Counsel: For Plaintiff, Charles Ala'ilima
For Defendants, John Ward

This case concerns land called Lugavai in Pago Pago. The facts are set forth in our opinion granting a partial summary judgment. We reaffirm those findings of fact, with the following additions and modifications:

1) Molitui Sepetaio, defendants' ancestor in title, moved to California in 1955 or shortly thereafter.

2) In or around 1965 T.S. Muasau, plaintiffs' ancestor in title, requested permission from Molitui Sepetaio to build a house on her property in Pago Pago. She not only gave permission but borrowed $2500 which she sent as a contribution toward the construction of the house.

3) Shortly after it was built this house was destroyed by the 1966 hurricane. It was replaced with a "hurricane house" which cost about $3500 to build. The construction was primarily paid for by the federal government, but T.S. Muasau took out a loan from the Development Bank (or from its predecessor institution, the Bank of American Samoa) to finance the remainder.

4) The purported signature of Molitui Sepetaio on the 1967 separation agreement seems dissimilar in almost every particular from her signature on two documents signed in 1951 and 1958 respectively.

44

Recognizing that her terminal illness began only a few days after she is supposed to have signed the document, we have examined the purported 1967 signature carefully to see if this might explain the discrepancies. There are, however, several flourishes and other distinctive features on the signature that are not so well explained by Molitui's age and weakness as by the hypothesis that someone else signed the paper. Moreover, the signature purports to be that of "Molitui Sepetaio Muasau." The unrefuted testimony of defendant Ferra that Molitui never went by the name "Muasau" is bolstered by the evidence of family history: her brother (T.S. Muasau) held the title Muasau but her father was Sepetaio. The weight of the circumstantial evidence is also against the theory that Molitui signed the document: it was registered with the Territorial Registrar in March of 1967, whereas the meeting with relatives in Los Angeles at which Molitui might conceivably have signed such a document did not take place until April. Her daughter, defendant Ferra, testified that Molitui had steadfastly resisted requests from T.S. Muasau to "put his name on the land." We conclude that the evidence preponderates against the genuineness of the signature.

5) On May 15, 1974, plaintiff Milaneta Roberts took out a loan for improvements on the house. The loan was in the principal amount of $8700 and was at 7 per cent interest. Payments of about $2700 were made prior to May 1979; these did not fully cover the interest, so that there was a balance in May 1979 of $9008. Since then payments of $8082 have been made. The remaining balance is $7098.97.

6) Defendant Ferra testified that when she returned to the island in 1978 or 1979 the house was already being rented to Island Beverage Company. Plaintiff Roberts testified that it was not rented at all until 1981. The former President of the Island Beverage Company has submitted an affidavit that the company did not rent the building until 1981, and we find that the evidence preponderates in favor of this conclusion.

7) Between 1981 and 1988 plaintiff Roberts received $11,000 in rents on the house and a $3000 insurance award for damages to it. She spent $6000 on renovations and $600 on an insurance premium.

45

8) During the same period (specifically between 1983 and 1986 when Island Beverage was paying rent to the defendants) the defendants received $10,500. They reported no expenses.

9) Plaintiff's witness on real estate values seemed consistently to err on the high side. From his testimony about discounted future rentals, however, it is possible to arrive at an estimate of the fair value of the house. On the assumption that the house would rent for $650 per month, the value of the house <u>and the land</u> would be about $50,000. It was clear from his testimony that at least half this value is attributable to the prime business location of the land; in his opinion the house is in terrible condition and still needs $7000 worth of work before it can be rented. Moreover, the $650 figure is based on what plaintiff says an unnamed Korean is willing to pay her for the house. A few months ago it rented for $350 per month. We therefore estimate the value of the house, apart from the land, at $15,000.

We conclude that there is some equity and some iniquity on both sides. On the one hand, T.S. Muasau or someone in concert with him seems to have forged his sister's signature. This goes a long way toward weakening the force of plaintiff's argument that public policy requires "the stability of separation agreements" to be sedulously fostered.

There is in any case not much force in this argument, as we observed in granting partial summary judgment. A separation agreement does not of itself entail the landowner's commitment to let the beneficiary remain on the land forever, or even for "the useful life of the building." For this very reason, a separation agreement rarely stands alone. Most often it is accompanied by the traditional obligation to let family members reside on communal land. The usual way to arrange for non-owners to build structures on individual land is by lease.[1]

---

[1] We remain unpersuaded that Lugavai was "really" the communal land of the Muasau family, or even of the Sepetaio family. Notwithstanding the testimony of plaintiff that Muasau allowed the land to be registered in his sister's name

The presence or absence of a separation agreement, or even the existence of a forged one, does not automatically tell the Court what to do about a house owned by one person on land owned by another. Our conclusion that Molitui did not sign the agreement is not as devastating to plaintiff's case as it might be. However she felt about signing papers, Molitui was more than willing to let her brother live on the land and even to build a house there. Moreover, plaintiff Roberts appears to have believed in good faith that her father had a legal right to keep the house on the land and that he had validly conveyed that right to her. She believed this when she borrowed $8700 for improvements on the house.

In 1979 the two sides to this litigation were about even, except for the Development Bank loan. Molitui had paid $2500 for a house for her brother to live in; Muasau had put up a thousand or two; his daughter Mrs. Roberts had made payments of about $2700 in interest during her father's lifetime; the federal government had also been persuaded to contribute. Muasau had been provided with a place to live out his life as Molitui had wished. Defendant Ferra owned the land; plaintiff Roberts was the equitable owner of the house at least to the extent of her investment in it. Had Mrs. Ferra wished to reoccupy the land she might have done so upon assuming the remaining balance on the Development Bank loan. Mrs. Roberts would have been entitled to this compensation even if Mrs. Ferra had no use for the house itself, since she had obligated herself in reliance on the erroneous but innocent impression that the house would remain on the land after her father's death. If Mrs. Ferra had wished not only to occupy the land but also to acquire the house, then the measure of her compensation to Mrs. Roberts should have been the fair value of the house.

---

because of his great love for her, the evidence shows that he knew how to look after his own interests and often did so. We were unsuccessful in our efforts to adduce much information at trial about how and when Molitui acquired the land, but we believe it was hers.

Since 1979 the arithmetic has been complicated by various transactions in which both sides have engaged. Since each side was willing to let the controversy simmer for several years while occupying the building and collecting rents, we need not allocate blame for the delay. We will assume, consistent with the testimony of plaintiff's witness on real estate values, that the rental value of the house was about equally attributable to the house itself and to the prime business location of the land. On this assumption, plaintiff and defendant should share equally in the net proceeds.

Since 1979 the plaintiff has collected $14,000 and has spent $14,682. Defendants have collected $10,500. If defendant Ferra wishes to repossess her land but not to acquire plaintiff's house, she should pay plaintiff Roberts $5591 (so that the two parties will have benefitted equally from the house and land between 1979 and 1988) and pay the remaining balance of $7098.97 on the Development Bank loan.

If Mrs. Ferra wishes to acquire the house as well as the land, she should pay its fair value. This we have estimated at $15,000. Of this amount $7098.97 should be paid to the Development Bank and $7901.03 (plus $5591 for interim rents) to Mrs. Roberts.

### Order

Judgment will enter in behalf of defendant Estate of Molitui Sepetaio, enjoining plaintiff Milaneta Roberts and those in concert with her from going on the land Lugavai.

Judgment will enter in behalf of plaintiff Milaneta Roberts and against the defendants in the amount of $5591.

Judgment will enter against defendant Estate of Molitui Sepetaio in the additional amount of $7098.97. The Estate should discharge this part of the judgment within 60 days by paying Mrs. Roberts' loan at the Development Bank or by arranging with the Bank for the assumption of the obligation and for the release of Mrs. Roberts from all further liability.

Finally, defendants should inform the Court within 60 days whether they wish to acquire plaintiffs' house or to seek its removal. If they wish to acquire it, judgment will enter in the additional amount of $7901.03 against defendant Estate of Molitui Sepetaio. If the defendants do not wish to acquire the house, plaintiffs will be given the opportunity to remove it. If defendants do not wish to acquire it and plaintiffs do not wish to remove it, defendants will be ordered to destroy it.

It is so ordered.